John B. Sganga, Jr. (SBN 116,211)
john.sganga@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Brian C. Horne (SBN 205,621)
brian.horne@kmob.com
Laura M. Blau (SBN 265,106)
laura.blau@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
10100 Santa Monica Boulevard, Suite 1600
Los Angeles, CA 90067
Phone (310) 551-3450
Facsimile: (310) 551-3458

Attorneys for Defendant and Counterclaimant
BJ's RESTAURANTS, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BARONESS SMALL ESTATES, INC., a Colorado corporation,<br><br>Plaintiff,<br><br>v.<br><br>BJ's RESTAURANTS, INC., a California corporation,<br><br>Defendant.<br><br>BJ's RESTAURANTS, INC., a California corporation,<br><br>Counterclaimant,<br><br>v.<br><br>BARONESS SMALL ESTATES, INC., a Colorado corporation,<br><br>Counterdefendant. | Case No. SACV11-00468 JST (Ex)<br><br>**DEFENDANT BJ'S RESTAURANTS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br><br><br><br><br><br>Hearing Date:   July 20, 2012<br>Time:              2:30 p.m.<br>Courtroom.:     10A<br><br>Honorable Josephine Staton Tucker |

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................. 1

II.   FACTS ................................................................................ 2

    A.    Baroness and its retail "Tempest" wines .......................... 3

    B.    BJ's and its "Tempest" IPA beer ....................................... 3

    C.    BJ's seeks a trademark registration for "TEMPEST" .................. 4

    D.    BJ's changes the name of "Tempest IPA" to "HopStorm IPA" ....................................................................... 5

III.  ARGUMENT ...................................................................... 6

    A.    Baroness's reliance on the proceedings in the Trademark Office is misplaced ......................................... 6

    B.    Baroness cannot prove that a likelihood of confusion existed ............................................................. 9

        1.    Baroness's mark was not strong enough ........................... 9

        2.    The parties' goods were not sufficiently similar ............... 10

        3.    The parties' marks were different as used in commerce ................................................................. 11

        4.    There was no actual confusion, and the survey evidence, as well as Baroness's own witnesses, confirm a lack of any likelihood of confusion .................. 13

        5.    The parties' sales and marketing channels were different ................................................................. 14

        6.    Purchasers of a specialty handcrafted beer likely took enough care to eliminate confusion ....................... 14

        7.    BJ's had no intent to affiliate itself with Baroness ........... 15

        8.    There is zero likelihood of expansion because BJ's stopped using the Tempest name ............................ 16

    C.    Baroness is not entitled to its attorneys' fees .................... 17

        1.    The facts demonstrate that BJ's did not act maliciously, fraudulently, deliberately, or willfully ......................................................... 17

1

**TABLE OF CONTENTS**
*(cont'd)*

**Page No.**

2.  Baroness relies on tenuous evidence to tell its story .................................................................................. 19

3.  The facts in this case do not meet the high standard required in this Circuit to award attorneys' fees .................................................................. 23

4.  Baroness's allegation that BJ's violated federal regulations is irrelevant and inaccurate ............................. 24

IV.  CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**Page No(s).**

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ............................................................. 2, 15, 16

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................. 19, 20

*Cairns v. Franklin Mint Co.*,
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) ......................................................... 13

*Carter-Wallace Inc. v. Procter & Gamble Co.*,
   434 F.2d 794 (9th Cir. 1970) ......................................................................... 8

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*,
   474 F. Supp. 2d 1148 (E. D. Cal. 2007) ........................................................ 8

*E & J Gallo v. Proximo Spirits, Inc.*,
   No. CV-F-10-411 LJO JLT, 2012 WL 273076
   (E. D. Cal. Jan. 30, 2012) ............................................................................ 16

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   314 F.2d 149 (9th Cir. 1963) ....................................................................... 11

*Garcoa, Inc. v. PH Beauty Labs, Inc.*,
   No. CV 09-4859 AHM (Ex), 2009 WL 2489223
   (C.D. Cal. Aug. 10, 2009) ...................................................................... 14, 15

*HGI Mktg. Servs., Inc. v. Pepsico, Inc.*,
   50 F.3d 14, 1995 WL 89385 (9th Cir. 1995) ................................................. 8

*In re Chatam Int'l Inc.*,
   380 F.3d 1340 (Fed. Cir. 2004) ................................................................... 11

*In re Shell Oil Co.*,
   992 F.2d 1204 (Fed. Cir. 1993) ................................................................... 12

*Int'l Olympic Comm. v. San Francisco Arts & Athletics*,
   781 F.2d 733 (9th Cir. 1986) ....................................................................... 17

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Internet Specialties West, Inc. v. ISPWest,*
No. CV 05-3296 FMC (AJWx), 2006 WL 4568053,
(C.D. Cal. Aug. 2, 2006) .................................................................. 9

*Lahoti v. VeriCheck, Inc.,*
586 F.3d 1190 (9th Cir. 2009) ........................................................ 8

*M2 Software, Inc. v. Madacy Entm't,*
421 F.3d 1073 (9th Cir. 2005) ................................................. 10, 16

*Nat'l Customer Eng'g, Inc., v. Lockheed Martin Corp.,*
No. CV 96-8938 DDP ............................................... 8, 15, 16, 22

*Polo Fashions, Inc. v. Dick Bruhn, Inc.,*
793 F.2d 1132 (9th Cir. 1986) .................................................. 23, 24

*Sands, Taylor & Wood v. Quaker Oats Co.,*
18 U.S.P.Q.2d 1457 (N.D. Ill. 1990) ...................................... 22, 23

*Sands, Taylor & Wood v. Quaker Oats Co.,*
978 F.2d 947 (7th Cir. 1992) ......................................................... 23

*Stephen W. Boney, Inc. v. Boney Servs., Inc.,*
127 F.3d 821 (9th Cir. 1997) ........................................................ 17

*Surfvivor Media, Inc. v. Survivor Prods.,*
406 F.3d 625 (9th Cir. 2005) ........................................................ 16

*The Chronicle Publ'g Co. v. Legrand,*
No. C-88-1897-DLJ, 1992 WL 420808 (N.D. Cal. Sept. 3, 1992) ............. 23

## OTHER AUTHORITIES

15 U.S.C. §1071 .............................................................................. 9

Fed. R. Evid. 402 ..................................................................... 20, 21

Fed. R. Evid. 602 ..................................................................... 20, 21

### TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

Fed. R. Evid. 802 ......................................................................... 20, 21

Fed. R. Evid. 901 ............................................................................. 20

37 C.F.R. §2.64 .................................................................................. 9

# I.  <u>INTRODUCTION</u>

Baroness's brief is more telling for what it ignores than what it says. Despite bearing the burden of proof, Baroness fails to address numerous facts that prove (1) consumers were not likely to be confused between BJ's Tempest IPA and Baroness's Tempest wine and (2) BJ's proceeded in good faith.  For example, Baroness ignores the following facts:

- The parties never sold their products in the same establishment. Instead, BJ's only sold its Tempest IPA in its own self-branded restaurants which never sold Baroness's Tempest wines.

- ███ The parties barely sold their products in the same state. ████████
███████████████████████████████████████
███████████████████████████████████████
███████████

- BJ's Tempest IPA was only sold on tap and all materials identifying the beer made clear that the beer came from BJ's.

- BJ's had never heard of Baroness when it decided to name its beer Tempest IPA.

- BJ's voluntarily approached Baroness to consent to co-exist.  At that time, Baroness had never heard of BJ's Tempest IPA.

- When Baroness refused to consent, BJ's began the process to change the name of its IPA.

In fact, Baroness never even contends that consumers were actually confused (or at least were likely to be), that BJ's tried to affiliate itself with Baroness, or that BJ's attempted to benefit from any goodwill in Baroness's mark.  Instead, Baroness argues that there was infringement here because the Trademark Office – which did not consider a complete record – did not grant BJ's application to register TEMPEST as a trademark for beer.  To reach that conclusion, however, Baroness rigidly applies a limited portion of the record to

- 1 -

1   the *Sleekcraft* factors.  But when the full record, and all *Sleekcraft* factors are

2   considered, the lack of infringement is evident and can be decided in BJ's favor

3   as a matter of law.

4        Baroness boldly seeks summary judgment on its claim for attorneys' fees,

5   despite BJ's good faith in adopting the TEMPEST mark without knowledge of

6   Baroness, voluntarily approaching Baroness to resolve the trademark issue, and

7   then voluntarily discontinuing use of the mark.  To support its attorney fee

8   request, Baroness not only ignores large portions of the record, but asks for

9   tenuous inferences to be drawn in its favor.  For example, the fact that some

10  third-party distributors continued to refer to Tempest IPA on their own internal

11  records is irrelevant to whether BJ's continued to use that name with customers

12  in its restaurants.  Similarly, the websites on which Baroness relies to contend

13  that BJ's continued using the TEMPEST mark after October 2010 come from

14  third parties.  Baroness conveniently neglects to mention that fact, as well as the

15  fact that BJ's witnesses testified to the many inaccuracies on those websites.

16  Finally, Baroness's allegation that BJ's violated federal labeling statutes is

17  irrelevant, inaccurate, and demonstrates the weakness of Baroness's analysis.

18       Therefore, Baroness cannot meet its burden of proving infringement or

19  entitlement to attorneys' fees.  At the very least, Baroness's motion should be

20  denied because it has not established a lack of a genuine issue of fact.

## II.  FACTS

22       BJ's has separately moved for summary judgment of noninfringement

23  and no disgorgement.  BJ's provided an extensive explanation of the facts in its

24  brief in support of that motion.  (*See* BJ's Mem. of P. & A. in Support of

25  Motion for Summary Judgment.)  BJ's relies on all of those facts in this

26  opposition and recounts an abridged version here.

27  / / /

28  / / /

**A.    Baroness and its retail "Tempest" wines**

In 2007, Baroness first began using the name "Tempest" for some of its wines.  (Dkt. No. 72 (6/20/12 Horne Decl.), Ex. 562 at 137:3-12, 139:5-20.) Baroness's "Tempest" wines all used a stylized label of the type shown here.  (*Id.* at 137:3-13, 138:14-139:20, Ex. 501.)



████████████████████████████

████████████████████████████

████████████████████████████

(*Id.* at 320:8-20, 323:13-18, Ex. 505, at 1412.)   Baroness has not sold its Tempest wines in any BJ's restaurant.  (*Id.* at 135:18-20.) Baroness has never sold beer, nor has it ever considered selling a "Tempest" beer.  (*Id.* at 68:20-69:4, 329:12-17.) ████████████████████████

████████████████████████████████████  (*Id.* at 117:2-126:7.)

**B.    BJ's and its "Tempest" IPA beer**

BJ's operates over 120 restaurants that are well known for BJ's own handcrafted beers.  (Dkt. No. 59 (Hood Decl.) ¶ 8.)  In early 2008, BJ's decided to offer an India Pale Ale ("IPA") as a "fill-in" beer at some of its restaurants. (Dkt. No. 72, Ex. 563 at 45:17-46:21.)  After brainstorming for names that were not used by other beer makers, BJ's chose the name Tempest IPA.  (*Id.* at 50:3-52:20.)  At that time, BJ's was unaware of Baroness, Baroness's Tempest wines, or Baroness's trademark registration for TEMPEST.  (Dkt. No. 71 (6/20/12 Puchner Decl.) ¶ 8.)

BJ's began selling Tempest IPA in May 2008 in some of its restaurants. (Dkt. No. 72, Ex. 563 at 54:11-55:3.)   It was never sold in any non-BJ's restaurant or in any retail store.  (*See id.*)  Like most of BJ's other beers, its Tempest IPA was only sold on tap.  (Dkt. No. 71 ¶ 3.)

/ / /

BJ's Tempest IPA was promoted almost exclusively within its self-branded restaurants. (Dkt. No. 59 ¶ 2.) In those restaurants, BJ's informed its guests in a few different ways when Tempest IPA was available. (*Id.*) For example, BJ's described the beer on a beer presenter card, included a description of the beer in menus that identified BJ's handcrafted beers, or listed Tempest IPA on a magnetic "beer board," using a magnetic strip with the words "TEMPEST IPA." (*Id.* ¶¶ 2-6, Exs. 557-559.)

As the samples show, these items demonstrated to customers that Tempest IPA was BJ's own beer by using phrases such as "BJ's Handcrafted Beer and Cider" or "BJ's Special Brews." (*See id.* ¶ 3.)



**Magnetic Board**



**Menu**



**Beer Card**

## C.   **BJ's seeks a trademark registration for "TEMPEST"**

In early 2009, BJ's decided to apply for a trademark registration for TEMPEST and, consequently, conducted a trademark search. (Dkt. No. 72, Ex. 563 at 88:12-21, 91:17-92:5.) That search informed BJ's for the first time that Baroness had a trademark registration for TEMPEST for wine. (*Id.* at 92:11-17; Dkt. No. 71 ¶ 8.)

Because BJ's believed that the wine and beer products were sufficiently different, and BJ's Tempest IPA was only being sold in its restaurants that never sold Baroness's wine, BJ's believed that using the Tempest name for its IPA

would not cause confusion.   BJ's also believed it was entitled to obtain a trademark registration for TEMPEST for beer.  (Dkt. No. 72, Ex. 563 at 92:6-93:4.)  The Trademark Office refused BJ's application for TEMPEST (and its amended application for BJ'S TEMPEST) in light of Baroness's registration.  (Dkt. No. 62 (Hyman Decl.) ¶¶ 3, 5.)  Those decisions, however, were based on the incorrect assumption that the parties' products were likely to travel through the same channels of trade.  (*Id.*, Exs. 569, 571.)

Rather than expending more time and money exhausting its options at the Trademark Office with further arguments, amendments, or appeals, BJ's voluntarily approached Baroness to alert Baroness of BJ's Tempest IPA and to seek consent from Baroness for BJ's trademark application to be registered.  (Dkt. No. 62 ¶ 6, Ex. 531; Dkt. No. 72, Ex. 563 at 105:1-106:2.)

When BJ's approached Baroness in June 2010, Baroness had little knowledge of BJ's and had no knowledge of BJ's Tempest IPA.  (Dkt. No. 72, Ex. 562 at 223:22-224:7.)  Nevertheless, Baroness refused to consent to BJ's continued use of the Tempest name.  (Dkt. No. 62 ¶ 7, Ex. 532)  Instead, Baroness made two offers to BJ's: either pay $125,000 to continue using the name or cease and desist.  (*Id.*)

**D.   BJ's changes the name of "Tempest IPA" to "HopStorm IPA"**

BJ's discussed Baroness's June 2010 demands at BJ's very next management meeting in July 2010 and decided to change the name of its IPA.  (Dkt. No. 72, Ex. 563 at 216:20-218:6; Dkt. No. 71 ¶ 11.)  Thus, BJ's promptly took steps to discontinue the "Tempest IPA" name.  (Dkt. No. 71 ¶¶ 12-15, Exs. 543-546; Dkt. No. 57 (Ferguson Decl.) ¶ 3.)

By September 2010, BJ's had chosen a new name – HopStorm IPA.  (Dkt. No. 71 ¶ 14.)  On September 24, 2010, BJ's wrote to Baroness, agreeing that BJ's would discontinue selling its Tempest IPA by October 15, 2010 and abandon its trademark application.  (Dkt. No. 62 ¶ 10, Ex. 536.)  BJ's kept its

promise when, on October 15, its executive team sent a directive that required its restaurants to immediately change the name of its IPA from Tempest to HopStorm.  (Dkt. No. 71 ¶ 15, Ex. 546.)  By that time, BJ's had sold only approximately ▮▮▮▮ of Tempest IPA.  (*Id.* ¶ 16, Ex. 547.)

### III.  ARGUMENT

### A.  Baroness's reliance on the proceedings in the Trademark Office is misplaced

Each aspect of Baroness's motion – infringement and entitlement to attorneys' fees – heavily relies on the fact that the Trademark Office did not grant BJ's a trademark registration for TEMPEST or BJ's TEMPEST.  For numerous reasons, Baroness's reliance is misplaced.

First, the Examining Attorney only addressed whether BJ's could obtain a registration for TEMPEST on beer.  Importantly, he did not determine whether BJ's could call its beer Tempest IPA in the marketplace.  Indeed, he could not possibly have made such a ruling because, besides the fact that he does not that authority, he did not have a complete record.

For example, the trademark registration that BJ's sought did not specify the way BJ's beer would be marketed or the places it would be sold.  Thus, the Examining Attorney did not consider the issues relevant to infringement here, namely that (1) Baroness never sold its Tempest wines in a BJ's restaurant and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 72, Ex. 562 at 68:20-69:4, 135:18-20, 329:12-17); (2) BJ's only sold its Tempest IPA in its own heavily-branded restaurants (Dkt. No. 71 ¶ 6); (3) BJ's was well known for brewing its own beer and used promotional items in its restaurants – such as menus, beer presenters, and magnetic boards – that told patrons that BJ's Tempest IPA came from BJ's (Dkt. No. 59 ¶¶ 3-6, 8, Exs. 557-559); and (4) a consumer survey demonstrated zero likelihood of confusion.

/ / /

Instead, the Examining Attorney based his conclusions regarding registration on assumptions that have been proven false in light of those facts. For example, without any foundation or supporting evidence, the Examining Attorney incorrectly assumed that the parties' products were likely to travel through the same channels of trade and that BJ's did not restrict its channels of trade. (Dkt. No. 62, Exs. 569, 571).

Moreover, the Examining Attorney did not rely on evidence that would be admissible in this lawsuit. He has not been qualified as an expert regarding consumer confusion or the manner in which beer and wine are sold, he never cited to any sworn testimony, and never considered any survey evidence.

Thus, Baroness's contention that the office actions contained numerous attachments containing evidence in support of the Examining Attorney's position is meaningless. (Br. at 21.) Other than attaching Baroness's trademark registration for TEMPEST, none of the attachments relate to BJ's, Baroness, either party's products, either party's chain of distribution, or any other fact concerning the parties' products in the marketplace. (Horne Decl. ¶ 12.) Instead, he merely attached a collection of third-party trademark registrations or websites relating to beer, wine, or other alcoholic beverages. (Horne Decl. ¶ 11.)

Indeed, those attachments are unreliable and would be inadmissible in this case. For example, the attached trademark registrations do not provide evidence that the registrant was actually selling all of the products listed on the registration. And although some of the websites do show a product, the Examining Attorney did not authenticate any of those documents and did not provide a foundation that any products from any of the websites were actually sold.

Thus, not surprisingly, the Ninth Circuit has held that an Examining Attorney's conclusions regarding registration should be given little, if any,

weight in an infringement action.  *See Carter-Wallace Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) (determinations made by the Trademark Office should be "regarded as inconclusive since [they are] made at its lowest administrative level"); *see also HGI Mktg. Servs., Inc. v. Pepsico, Inc.*, 50 F.3d 14, 1995 WL 89385, at *2 (9th Cir. 1995) (unpublished).   An Examining Attorney's conclusions are rendered even "less persuasive" where, as here, the Examining Attorney "did not have before it the great mass of evidence which the parties have since" gathered through discovery.  *Carter-Wallace Inc.*, 434 F.2d at 802.

To convince this Court to ignore the "great mass of evidence," Baroness relies on several inapposite cases to argue that this Court should simply defer to the Examining Attorney's conclusions.  (Br. at 6.)  But most of those cases did not even address whether a court in a trademark infringement action should give deference to an Examining Attorney's conclusions regarding registrability.  *See Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 474 F. Supp. 2d 1148, 1155 (E. D. Cal. 2007) (addressing construction of ***patent*** claim terms); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009) (Examining Attorney's classification regarding distinctiveness of a mark should be given some weight in a trademark ***registration*** case).

In fact, Baroness relies on only one decision from this circuit, *Lockheed*, which even addressed whether courts in a trademark infringement action should consider an Examining Attorney's conclusions regarding registrability.  But that court expressly held that the conclusions of an examining attorney are "not dispositive."  *Nat'l Customer Eng'g, Inc., v. Lockheed Martin Corp.*, No. CV 96-8938 DDP (ANx), 1997 WL 363970, at *1039 (C.D. Cal. Feb. 14, 1997).  In any event, that district court decision cannot outweigh the contrary Ninth Circuit authority or the fact that the Examining Attorney did not consider all of the facts present here.

1    Second, Baroness inaccurately states that BJ's "vigorously contested" the

2  Trademark Office's findings.  (Br. at 7.)  In reality, BJ's responded by simply

3  amending its mark to BJ'S TEMPEST.  In fact, BJ's did not even respond to the

4  second office action and instead voluntarily approached Baroness for consent.

5    Finally, Baroness misleadingly refers to the March 28, 2010 office action

6  as a "Final Office Action."  (Br. at 21.)  Although the office action was titled as

7  such, it was not the final word on BJ's application.  For example, BJ's could

8  have filed a request for reconsideration.  *See* 37 C.F.R. §2.64(b).  Also, as the

9  office action itself stated, BJ's could have appealed to the Trademark Trial and

10  Appeal Board ("TTAB").  (Dkt. No. 62, Ex. 571.)  And BJ's could have

11  appealed an adverse decision from the TTAB to a district court or the Federal

12  Circuit.  *See* 15 U.S.C. §1071(a)-(b).

13    In sum, Baroness cannot use the Examining Attorney's conclusions to

14  substitute for a review of all the facts of record now, which demonstrate no

15  likelihood of confusion with respect to the manner in which the marks were

16  actually used in the marketplace.

17  **B.**    **Baroness cannot prove that a likelihood of confusion existed**

18        **1.**    **Baroness's mark was not strong enough**

19    Baroness merely relies on the supposed arbitrary nature of its mark and

20  presents no evidence to support a conclusion that its mark is strong because of

21  any name recognition by consumers.  *See Internet Specialties West, Inc. v.*

22  *ISPWest*, No. CV 05-3296 FMC (AJWx), 2006 WL 4568053, at *12 (C.D. Cal.

23  Aug. 2, 2006).  ████████████████████████████████████

24  ████████████████████████████████████████████████████

25  █████████████  (Dkt. No. 72, Ex. 562 at 117:2-126:7, 320:8-20, 323:13-18,

26  Ex. 505, at 1412.)  ██████████████████████████████, Baroness's

27  Tempest wines have no significant name recognition, and Baroness did not

28  create a strong mark.

1    In addition, numerous third parties use "Tempest" in connection with

2    alcoholic products.  *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073,

3    1088 (9th Cir. 2005) ("Use of similar marks by third-party companies in the

4    relevant industry weakens the mark at issue.").  For example, BJ's was able to

5    purchase from third parties two different wines, a beer, and a liqueur that each

6    use the name "Tempest."  (*See* Dkt. No. 71 ¶¶ 20-24, Exs. 548-556.)

7        **2.**      **The parties' goods were not sufficiently similar**

8    As BJ's explained in its own motion, and Baroness has agreed, wine and

9    beer, let alone IPA craft beer, are rarely, if ever, sold under the same brand.

10    (*See* Dkt. No. 72, Ex. 562 at 421:1-5.)  In other words, unlike food or beverage

11    products sold under a blanket brand, beer and wine products are typically

12    branded separately.   Therefore, a customer would not ordinarily think

13    Tempest IPA and Tempest wines came from the same source just because they

14    both used the name "Tempest."

15    Indeed, Baroness ignores that it has previously ███████████████

16  ███████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████

25  ███████  If Baroness agrees that ██████████████████████████

26  ███████████████████████████████████████████ it can hardly argue

27  that beer and wine are so similar as to require a finding of infringement.

28  */ / /*

Further, *Fleischman* and *Chatam* are distinguishable.  Indeed, neither case held that various alcoholic beverages were so related as to require a finding of confusion.    For example, in *Fleischman*, one of the customers for the defendant's beer raised the issue of the plaintiff's famous mark for scotch to the defendant, and the court believed that the defendant was attempting to capitalize on the popularity of the plaintiff's mark.  *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 156-57 (9th Cir. 1963).  Under those circumstances, the court found that the defendant's use was not so foreign "as to insure against" any confusion with the plaintiff.  *Id*. at 160.  In other words, the defendant could not use the fact that beer and scotch were different goods to avoid the overwhelming evidence of confusion.  BJ's, by contrast, does not contend that beer and wine could never be close enough to cause confusion.  Instead, on the facts of this case, the products are sufficiently different.

In *Chatam*, which was an appeal to the Federal Circuit regarding the denial of a trademark application, the court held that tequila and beer "are marketed in many of the same channels of trade to many of the same consumers."  *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1345 (Fed. Cir. 2004).  The court also stated that it was resolving doubts against the applicant.  *Id.*  But as mentioned numerous times here, BJ's Tempest IPA and Baroness's Tempest wines were not marketed in the same channels of trade.  In fact, Baroness has not presented evidence of a single customer who has purchased both a bottle of its Tempest wine and a glass of BJ's Tempest IPA during the short time it was on sale.

### 3.    The parties' marks were different as used in commerce

Baroness ignores that although each party's product uses the word "Tempest," the overall context of the parties' marks as used in commerce was very different.  Baroness's wines appeared with a stylized logo with artistic imagery affixed to their bottles.  (Dkt. No. 72, Ex. 562 at 138:14-139:4, Ex.

501.)  As shown, the wine labels had detailed artwork and the word "Tempest" was stylized with a capital "T." (*Id.*, Ex. 501.)





**Beer Card**

In contrast to Baroness's logo, BJ's use of "Tempest" was never stylized, and BJ's referred to "Tempest IPA" or "BJ's Tempest IPA." (Dkt. No. 59 ¶¶ 2-6, Exs. 557-559.)  Moreover, "Tempest" was always surrounded by branding that identified the beer within the context of BJ's restaurants.  (*Id.* ¶¶ 3-8, Exs. 557-560; Dkt. No. 71 ¶ 7, Ex. 542.)

On a separate note, Baroness appears to argue that, if the marks are similar enough, the Court must find a likelihood of confusion if there is at least "a viable relationship between the respective goods or services."  (Br. at 12, *citing In re Shell Oil Co.*, 992 F.2d 1204 (Fed. Cir. 1993).)  Tellingly, Baroness does not provide a pinpoint cite for that citation, likely because *Shell* does not support it.   Instead, *Shell* merely states that if goods or services are not competitive, "the use of identical marks ***can*** lead to the assumption that there is a common source." *Shell Oil*, 992 F.2d at 1207 (emphasis added).  In any event, as discussed above, and in addition to the fact that *Shell* addressed registrability instead of infringement, the marks in this case were not identical as used in commerce.

/ / /

/ / /

/ / /

### 4.   There was no actual confusion, and the survey evidence, as well as Baroness's own witnesses, confirm a lack of any likelihood of confusion

Although Baroness concedes that it has no evidence of actual confusion, it ignores three facts explained in BJ's motion:  (1) Baroness never conducted a survey of consumers, (2) BJ's did commission a survey in which no participant was confused, and (3) Baroness's own witnesses have admitted that a patron in a BJ's restaurant would have known that BJ's Tempest IPA came from BJ's.

Baroness's failure to conduct a survey is not only conspicuous, but weakens its case because "a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable."  *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998).

That adverse inference is confirmed by a survey from Kenneth Hollander, BJ's expert, in which none of the 300 participants believed that any wine company, let alone Baroness, produced BJ's Tempest IPA.  (*See* Dkt. No. 72, Ex. 565 (Expert Report of Kenneth Hollander) at 11.)

Finally, Baroness's own witnesses confirm those findings.  Specifically, Baroness hired an expert to criticize Mr. Hollander.   But in his befuddled attempt to do so, Baroness's expert actually confirmed that the manner in which BJ's Tempest IPA was presented on its menu eliminated any likelihood of confusion:

> Given the stimulus to which they are exposed, the only reasonable conclusion to which respondents can come is ***that anything on the list is associated with BJ's restaurants***.

(Dkt. No. 72, Ex. 566 (Expert Report of Eli Seggev) at ¶ 19 (emphasis added).)

Similarly, Baroness's owner agreed that BJ's customers would assume that Tempest IPA came from BJ's.  (Dkt. No. 72, Ex. 562 at 335:3-9 ("I would

certainly think if it said 'BJ's Tempest' on it that **they would assume that . . . the brand was owned or produced by BJ's**.") (emphasis added).)

### 5.    The parties' sales and marketing channels were different

Once again, Baroness ignores the facts.    As BJ's has repeatedly explained, (1) BJ's Tempest IPA and Baroness's Tempest wines were never sold in the same establishment and ███████████████████████████ ████ ; (2) BJ's almost exclusively "marketed" its Tempest IPA inside its restaurants; (3) the marketing in those restaurants told customers that Tempest IPA came from BJ's; and (4) ███████████████████████████ ██████████████████    obviously, never marketed inside BJ's restaurants.    Thus, customers would never have been presented with a simultaneous choice between BJ's beer and Baroness's wine.

Rather than addressing these facts, Baroness once again hides behind the Examining Attorney's incorrect and undocumented statement that the parties' goods were "likely to travel through the same channels of trade and to the same class of purchasers."    (Br. at 14.)    Baroness also offers mere argument that "purchasers of wine and purchasers of beer . . . would tend to overlap to a great extent."    (*Id.*)    That argument cannot rebut the evidence that the parties' products were never sold in the same establishment.    Nor does Baroness present any evidence that a single one of its customers set foot in a BJ's restaurant, let alone ever purchased or considered purchasing BJ's Tempest IPA.

### 6.    Purchasers of a specialty handcrafted beer likely took enough care to eliminate confusion

Although beer and wine are relatively inexpensive, "price alone is not determinative of the care a consumer will take in making purchases, and [the] touchstone remains the general impression that is left with the ordinary consumer." *Garcoa, Inc. v. PH Beauty Labs, Inc.*, No. CV 09-4859 AHM (Ex), 2009 WL 2489223, at *8 (C.D. Cal. Aug. 10, 2009) (citations omitted).    "Thus,

while a court might find that, generally, purchasers of relatively inexpensive items are not sophisticated, it must look at the specific products in question rather than just the price." *Id.*

In this case, as BJ's explained in its motion, Tempest IPA would typically have been carefully selected and purchased by a craft-beer enthusiast. (Dkt. No. 71 ¶ 5.) Indeed, IPA is high in hops, has a strong bitter flavor, and typically does not appeal to an average beer drinker. (Dkt. No. 71 ¶ 5.) Thus, although BJ's Tempest IPA was not particularly expensive, a reasonably prudent consumer likely would take the time to distinguish between the two product lines.

### 7.   BJ's had no intent to affiliate itself with Baroness

Although Baroness acknowledges the case law, its analysis ignores that this *Sleekcraft* factor refers to a defendant's intent when it ***adopted*** its mark. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir. 1979). Thus, Baroness also ignores that BJ's was wholly unaware of Baroness or its Tempest wines when BJ's selected the Tempest name for its beer. (Dkt. No. 71 ¶ 8.) In other words, Baroness ignores that BJ's adopted the Tempest name in good faith.

Baroness does not dispute any of this. Instead, citing to *Lockheed*, Baroness argues that BJ's did not immediately stop using the Tempest name once it learned about Baroness. But Baroness's reliance on *Lockheed* is misplaced. (*See* Br. at 18.) First, the plaintiff in *Lockheed* had a much stronger infringement case. For example, the parties each used the word "Mountain" for similar computer data storage products, and there were multiple instances of actual confusion. *Lockheed*, 1997 WL 363970, at *1039. Moreover, after the defendants became aware of the plaintiff's mark and their trademark application was rejected, they merely continued their use. *Id.*

/ / /

Baroness ignores the different facts of this case. When the Trademark Office initially denied BJ's application for TEMPEST, BJ's amended its mark to BJ'S TEMPEST. When the amended mark was denied registration, BJ's voluntarily approached Baroness to seek its consent to co-exist. (Dkt. No. 62 ¶ 6, Ex. 531.) After Baroness refused, BJ's quickly began the process to change the name of its IPA. (Dkt. No. 71 ¶¶ 11-15, Exs. 543-546.) Finally, Baroness has never contended that BJ's ever traded on Baroness's goodwill or otherwise tried to affiliate itself with Baroness or its Tempest wine. And unlike *Lockheed*, there were no instances of actual confusion here.

For all of these reasons, this factor weighs against a finding of a likelihood of confusion. *See, e.g.*, *M2 Software*, 421 F.3d at 1085 (intent factor weighed in favor of accused infringer, even though it was aware of plaintiff's mark before adopting its competing mark, because plaintiff failed to show accused infringer had any intention of capitalizing on plaintiff's mark); *see also E & J Gallo v. Proximo Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 WL 273076, at *19 (E. D. Cal. Jan. 30, 2012).

### 8. There is zero likelihood of expansion because BJ's stopped using the Tempest name

Baroness repeatedly cites to cases that require a "strong" likelihood that a party may expand its product line. (*See* Br. at 18-19, *citing Sleekcraft*, 599 F.2d at 354; *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005).) Baroness, however, merely contends that Baroness "may" expand its goods to include beer. (Br. at 19.)

But any present speculation that Baroness "may" sell beer ignores that BJ's changed the name Tempest for its IPA almost two years ago. (Dkt. No. 72, Ex. 563 at 71:13-72:4.) During that time, Baroness never sold a beer and, to this day, has never considered selling a beer named "Tempest." (*Id.*, Ex. 562 at 169:6-8.) Thus, there is zero likelihood of expansion.

**C.**     **Baroness is not entitled to its attorneys' fees**

    **1.**     **The facts demonstrate that BJ's did not act maliciously,**
        **fraudulently, deliberately, or willfully**

For all of the reasons set forth above, Baroness cannot even establish as a matter of law that it should be the prevailing party. Moreover, to find that this is an exceptional case and to award attorneys' fees, the Court must find that "the infringement is malicious, fraudulent, deliberate, or willful." *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 825-26 (9th Cir. 1997). Further, an award of attorneys' fees is discretionary "even if it fits within the statutory standard of an exceptional circumstance." *Int'l Olympic Comm. v. San Francisco Arts & Athletics*, 781 F.2d 733, 738 (9th Cir. 1986).

The record here, however, demonstrates that BJ's acted in good faith, and its behavior was nowhere near the high standard necessary to declare this an exceptional case. For example, BJ's adopted its Tempest IPA name with no knowledge of Baroness, Baroness's Tempest wine, or Baroness's TEMPEST trademark. (Dkt. No. 71 ¶ 8.) Baroness never disputes these facts. Therefore, BJ's decision to sell a beer named Tempest IPA cannot make this an exceptional case.

Instead, Baroness argues that once BJ's application for its own trademark registration was denied, BJ's was required to stop using the Tempest name. But Baroness ignores that, despite the fact that the Examining Attorney was not deciding whether BJ's had permission to use the Tempest name and that there was no confusion in the marketplace, BJ's did not merely move ahead. Instead, when the Trademark Office initially denied BJ's application, BJ's amended to include its "BJ'S" house mark, as it had done in other cases. (Dkt No. 62 ¶ 4; Dkt. No. 59 ¶ 9.) After the Trademark Office denied the amended application, rather than continuing to fight by seeking reconsideration or appeal, BJ's

/ / /

voluntarily approached Baroness on June 1, 2010 to seek consent to co-exist. (Dkt. No. 62 ¶ 6, Ex. 531; Dkt. No. 72, Ex. 563 at 105:1-106:2.)

Importantly, at that time, Baroness had little knowledge of BJ's and had never heard of BJ's Tempest IPA. (Dkt. No. 72, Ex. 562 at 222:22-224:7.) This fact is telling.  Baroness contends that for almost two years, BJ's willfully infringed Baroness's trademark rights.   But despite that supposed blatant infringement, Baroness had never even heard of BJ's Tempest IPA and was barely aware of BJ's at all. ██████████████████████████████ ████████████████████████████████ (Dkt. No. 72, Ex. 562 at 338:20-340:15.)  Thus, if BJ's was trying to infringe and trade on Baroness's goodwill, it did a pitifully poor job.  Indeed, there is no evidence that BJ's ever tried to trade on Baroness's good will or otherwise affiliate itself with Baroness.

Finally, and as another demonstration of BJ's good faith, once Baroness refused to co-exist in June 2010, BJ's almost immediately decided at its July 2010 management meeting to change the name of its IPA to eliminate "Tempest."  (Dkt. No. 71 ¶ 11.)  Thus, by September 2010, BJ's had chosen a new name – HopStorm IPA – and informed Baroness that it would change.  (*Id.* ¶¶ 12-15; Dkt. No. 62 ¶ 10, Ex. 536.)  On October 15, 2010, BJ's officially switched to HopStorm IPA.  (Dkt. No. 71 ¶ 15, Ex. 546.)

Moreover, any attorneys' fees incurred by Baroness are its own fault because it did not have to bring this lawsuit.  Indeed, BJ's stopped selling its accused beer long before Baroness sued.  After BJ's communicated to Baroness in September 2010 that BJ's would stop using the Tempest name, Baroness never communicated with BJ's until it brought this lawsuit in March 2011. (Dkt. No. 62 ¶ 12.)  Instead, Baroness rushed to judgment based on a flimsy investigation of third-party websites and sued BJ's without ever confronting BJ's with its "evidence."  Further, until very recently, Baroness has refused to even discuss settlement, and it insisted on conducting mediation at nearly the

latest possible date before the deadline.  (Horne Decl. ¶¶ 14-16.)   Thus, if the Court were to grant summary judgment regarding this issue, it should rule to dismiss Baroness's claim.  At the very least, especially with inferences drawn in BJ's favor, Baroness cannot establish that no questions of fact remain.

### 2.    Baroness relies on tenuous evidence to tell its story

Baroness misguidedly contends that BJ's management was "urging" its restaurants to maintain the sale of Tempest in July 2010 after the proceedings in the Trademark Office.  (*See* Br. at 21-22.)  But by July 2010, BJ's had decided to change the name of its IPA to eliminate "Tempest."  (Dkt. No. 71 ¶¶11-13, Exs. 543-45.)  In fact, on July 21, 2010, management specifically decided to "hold off on listing" Tempest IPA on its website until it had a new name.  (*Id.*, Ex. 544).  Thus, in the emails to which Baroness cites, BJ's management was merely communicating that its IPA should continue to be sold, not that it was urging promotion of the Tempest name.   (6/29/12 Puchner Decl. ¶¶ 2-6.) Because any inferences regarding these emails must be drawn in BJ's favor, they cannot help to establish entitlement to attorneys' fees on summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Baroness also pretends that it initiated contact with BJ's by writing a cease and desist letter on June 8, 2010.  (Br. at 22.)  But Baroness ignores that BJ's contacted Baroness first and, at that time, Baroness had never heard of BJ's Tempest IPA.  (Dkt. No. 72, Ex. 562 at 223:22-224:7.)   And, as explained above, regardless of whether BJ's immediately communicated with Baroness, BJ's decided by July 2010 to change the name of its IPA.  After it had decided on a new name – HopStorm IPA – in September 2010, BJ's communicated to Baroness that it would cease use on October 15, 2010.  (Dkt. No. 62 ¶ 10, Ex. 536.)

Finally, Baroness's contention that BJ's continued to sell Tempest IPA after October 15, 2010 could not even raise a question of fact with inferences

drawn in its own favor, let alone with inferences drawn in BJ's favor.  *See Anderson,* 477 U.S. at 255 (inferences are drawn in non-movant's favor).  For example, Baroness cites to two types of inadmissible documents.  First, it relies on documents from BJ's distributors – who are third parties and not controlled by BJ's in any way – to suggest that BJ's continued to use the Tempest IPA name in its restaurants after October 2010.  (Br. at 22-23.)  But those documents are irrelevant because distributor invoices demonstrate nothing regarding the name used for beer sold in BJ's restaurants.  Indeed, although BJ's informed its distributors that it had changed from Tempest IPA to HopStorm IPA, it has no control over the manner in which its distributors track or invoice BJ's beer.  (Oliver Decl. ¶¶ 5-6.)  In fact, distributors often resist adding new codes into their systems, and therefore often refer to a beer by a different name in their records than is used in BJ's restaurants.  (*Id.* ¶ 7.)  Therefore, even if a distributor referred to "Tempest IPA" in its records after October 2010, there is no reason to believe that the beer was called Tempest IPA instead of HopStorm IPA in BJ's restaurants.  (*Id.* ¶ 8.)  Thus, the distributor documents are inadmissible due to at least irrelevance, hearsay, and a lack of foundation.  *See* Fed. R. Evid. 402, 602, 802, and 901.

Further, some of the distributor documents on which Baroness relies confirm that BJ's did change to HopStorm IPA.  For example, a document from Beer House Distributors – one of the only two distributors to which Baroness cites – appears to reference a summary of sales from January 2008 to December 2010.  (*See* 6/22/12 Cusick Decl., Ex. AF.)  Above what appears to be a summary of transactions, the document refers to "HopStorm (Tempest) IPA."  (*Id.*)  Thus, a reasonable juror could easily conclude that the distributor recognized that the name of the same beer was switched from Tempest IPA to HopStorm IPA.

/ / /

In addition to the distributor documents, Baroness relies on an internet search that it and its attorneys apparently conducted in January 2011.  (Br. at 23.)  Again, Baroness's cursory statement hides the true facts, which far from prove that "[BJ's] customers were still purchasing TEMPEST beer at [BJ's] restaurants."  (*See id.*)

As an initial matter, Baroness conveniently neglects to mention that it relies on websites from third parties – not BJ's.  Also, and more seriously, Baroness ignores that Matt Hood, BJ's Chief Marketing Officer, testified that many of those websites are riddled with inaccuracies.  For example, one website listed multiple beers that BJ's no longer sold.  (Horne Decl., Ex. 575 (Hood Dep.) at 246:19-248:7.)  Another listed a BJ's menu with multiple products that BJ's does not carry.  (*Id.* at 248:8-249:13.)  Another recited phrases that BJ's never used, provided inaccurate information regarding BJ's brewers, and had not updated the list of BJ's awards since 2008.  (*Id.* at 262:9-263:2.)

Mr. Hood also testified about the one website that Baroness provides here – untappd.com.[1]  He explained that the website referred to "BJ's Chicago Pizza & Brewery," even though that particular restaurant had not used that name for seven to eight years.  (*Id.* at 252:17-253:18.)  Mr. Hood also explained that the beers may have been chosen from a drop-down menu, which would have allowed a patron to choose discontinued beer.  (*Id.* at 254:10-14.)  Indeed, a review of untappd.com today reveals that Tempest IPA is still a choice for customers, and still suggests that customers have drunk a Tempest IPA within the last few months.  *Id.*, Ex. 576 (http://untappd.com/beer/9535.)  But even Baroness does not contend that BJ's is currently selling Tempest IPA.  Thus, untappd.com has no credibility and is inadmissible due to at least irrelevance, hearsay, and a lack of foundation.  *See* Fed. R. Evid. 402, 602, and 802.

---

[1]   The website address is inaccurately shown as "on tap.com" in the deposition transcript.

1    Finally, Baroness makes the leap in logic that because BJ's did not have

2    approval from the relevant authorities to ship a keg labeled as HopStorm until

3    January 2011, BJ's sold beer in its restaurants called Tempest IPA until then.

4    (Br. at 23.)  Once again, Baroness's logic is weak and ignores the full record.

5    BJ's concedes that it did not obtain label approval for HopStorm until

6    January 2011.  But, as Alex Puchner, BJ's Senior Vice President of Brewing

7    Operations, explained in his deposition, ████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████   Further, it is not necessary to

13   obtain special paperwork to sell a beer by a particular name at a restaurant.  (*Id.*

14   at 127:20-128:4.)

15   Moreover, Baroness undermines its argument that BJ's did call its IPA

16   HopStorm in its restaurants until January 2011 because Baroness acknowledges

17   that BJ's did not have label approval for Tempest until March 2010.  (Br. at 21-

18   22.)  Baroness certainly does not contend that BJ's only began selling Tempest

19   IPA in its restaurants then, and Baroness has not limited its damages claim to

20   begin in March 2010.

21   For all of the reasons described here, the two cases to which Baroness

22   cites, *Lockheed* and *Sands*, do not support its argument.  (*See* Br. at 20-21.)

23   First, neither addresses the issue of exceptional case or entitlement to attorneys'

24   fees.  Instead, each analyzes intent as part of the infringement analysis.  *See*

25   *Lockheed*, 1997 WL 363970, at *1039; *Sands, Taylor & Wood v. Quaker Oats*

26   *Co.*, 18 U.S.P.Q.2d 1457 (N.D. Ill. 1990).   In fact, the court in *Sands*

27   specifically stated that "mere knowledge on the part of the defendant of the

28   plaintiff's mark and the defendant's refusal to relinquish its mark upon demand

- 22 -

are not necessarily indicative of bad faith." *Sands*, 18 U.S.P.Q.2d at 1471. Further, when addressing *Sands* on appeal, the Seventh Circuit held that intent is not even relevant to infringement unless the defendant "intended 'to palm off his products as those of another,' thereby profiting from confusion." *Sands, Taylor & Wood v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992) (citation omitted).   Thus, contrary to Baroness's contention, *Sands* does not hold that merely utilizing a trademark in any way without conducting a trademark search is per se willful infringement.  (*See* Br. at 20.)

### 3. The facts in this case do not meet the high standard required in this Circuit to award attorneys' fees

In this Circuit, the degree of culpability required to render a case "exceptional," thus warranting attorneys' fees, is exceptionally high.  *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132 (9th Cir. 1986).  For example, in *Polo*, attorneys' fees were denied even though the defendant's actions were characterized as a "callous disregard for the rights of the mark holder and a willful infringement." 793 F.2d at 1133-34.  In *Polo*, the defendant represented to the plaintiff that it had ceased selling and shipping counterfeit shirts when, in fact, it had not. *Id.* at 1133.  The Ninth Circuit upheld the district court's refusal of attorneys' fees, reasoning that attorneys' fees are available only in "exceptional" cases. *Id.* at 1134.

Similarly, in *The Chronicle Publ'g Co. v. Legrand*, the defendant's conduct did not rise to the high level necessary to justify an award of attorneys' fees, even though the defendant willfully and deliberately disregarded the plaintiff's prior rights.  No. C-88-1897-DLJ, 1992 WL 420808, at *9 (N.D. Cal. Sept. 3, 1992).  In *Chronicle*, the defendant testified that he was personally aware of two instances of consumer confusion.  *Id.*  Even so, the defendant "selfishly" decided that he wanted to use the plaintiff's trademark and "went ahead and used [it]." *Id.* at *10.  Still, the court denied attorneys' fees. *Id.*  The

court explained that something more than reckless or intentional infringement is necessary, that the great majority of Lanham Act cases require a high degree of culpability on the part of the infringer, and that attorneys' fees are aimed at eliminating blatantly fraudulent activity.  *Id.* at \*9.  Moreover, the court held as a matter of law that attorneys' fees are only appropriate if the infringing defendant intended to pass off his goods for that of the plaintiff, or otherwise engaged in fraudulent activity.  *Id.*

> **4.    Baroness's allegation that BJ's violated federal regulations is irrelevant and inaccurate**

Baroness contends that BJ's violated federal law by selling Tempest IPA in its restaurants without having approval to ship a keg labeled as "Tempest." But Baroness never pled such a claim, has not demonstrated standing to bring such a claim, and cannot demonstrate that such a claim has any relation whatsoever to trademark infringement.   In any event, as usual, Baroness's "logic" skips steps.

It is not clear whether Baroness alleges that BJ's violated a statute by (1) allegedly labeling a keg with Tempest without approval or (2) calling a beer Tempest IPA in its restaurants without shipping the keg of that beer labeled as Tempest.  Baroness cannot prove either.  First, Baroness does not point to any evidence of the former. ████████████████████████ ████████████████████████████████ (*See supra.*)  Second, Baroness does not cite any rule to support the latter.  Instead, it merely cites rules requiring beer to be labeled when it is shipped.  But Baroness cites to nothing that says draft beer must be sold under a name in a restaurant that matches the label placed on the keg of that beer when it is shipped.

Therefore, Baroness's allegation is irrelevant and unsupportable, and it sheds valuable light on Baroness's credibility and the quality of its analysis throughout its brief.

## IV.  CONCLUSION

For the foregoing reasons, Baroness has failed to meet its burden of proof and its motion should be denied.  Moreover, by cross-moving for summary judgment, Baroness has conceded that no fact issues exist regarding infringement and that the issue can be decided by the Court.  Thus, the Court should grant BJ's co-pending motion for summary judgment.[2]

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 29, 2012          By: _____

Brian C. Horne

Attorneys for Defendant and Counterclaimant
BJ's RESTAURANTS, INC.

---

[2] Importantly, however, the converse is not true.  In other words, because Baroness has not met its burden of proof and has ignored much of the record, the Court need not grant Baroness's motion if it declines to grant BJ's motion.